WEST/CRS

2010-1199, -1344

# United States Court of Appeals
# for the Federal Circuit

MEDIA QUEUE, LLC,

*Plaintiff-Appellant,*

v.

NETFLIX, INC.,

*Defendant-Cross Appellant,*

and

BLOCKBUSTER, INC.,

*Defendant-Appellee,*

and

GREENCINE HOLDINGS, LLC,

*Defendant.*

*Appeal from the United States District Court for the Northern District of California in case no. 09-CV-1027, Judge Susan Illston.*

## MEDIA QUEUE'S CORRECTED REPLY IN SUPPORT OF ITS PRINCIPAL BRIEF AND RESPONSE IN OPPOSITION TO NETFLIX'S CROSS APPEAL

JOHN EDMONDS, ESQ.
COLLINS, EDMONDS & POGORZELSKI, PLLC
1616 S. Voss Road, Suite 125
Houston, Texas 77057
Phone: (713) 364-5291
Fax: (832) 415-2535

*Attorneys for Plaintiff-Appellant
Media Queue, LLC*

September 9, 2010

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Media Queue, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

  Media Queue, LLC

2.     The real name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

  Not Applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

  None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

COLLINS, EDMONDS & POGORZELSKI, PLLC :     John Edmonds, Esq.

ALSTON & BIRD LLP :  Michael Newton, Esq., Jason Cook, Esq., Stacey White, Esq. (appeared in trial court)


September 9, 2010

John Edmonds
Attorney for Plaintiff-Appellant Media Queue

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................ ii

TABLE OF AUTHORITIES ............................................................... vi

STATEMENT OF THE ISSUES........................................................... 1

STATEMENT OF THE CASE AND THE FACTS................................. 2

SUMMARY OF THE ARGUMENT ..................................................... 3

ARGUMENT ...................................................................................... 5

I.    THE DISTRICT COURT ERRED BY CONSTRUING CRITICAL
    CLAIM TERMS TOO NARROWLY ......................................... 5

    A.  "Notification Rules" Should Not Be Limited to Notifications
        "About Queue Status".............................................................. 5

        1.  The Principle of Claim Differentiation Supports Media
            Queue's Construction of "Notification Rules"................... 6

        2.  Notification Rules "For The Subscriber Rental Queue" are
            Not Limited to Notifications "About Queue Status".......... 7

        3.  Netflix Either Ignores the Examples in the Specification or
            Takes the Examples Out of Context. ................................. 9

    B.  "Queue Replenishment Control Rules" Are Not Limited to Rules
        Regarding Automatic Addition of Titles to the Queue......................... 10

        1.  The Specification Contemplates a Broad Construction of
            Queue Replenishment Control Rules ............................... 11

        2.  Netflix Continues to Misconstrue the Prosecution History by
            Asserting That Mr. Gross Narrowed the Definition of Queue
            Replenishment Control Rules during Prosecution ............ 13

3. The District Court Ignored the Plain Meaning of "Can" And Interpreted That Word to Mean "Must" in the Context of Allowing Automatic Features to Be a Part of Queue Replenishment Control Rules ........................................................... 15

4. Claim Differentiation Shows that the Patentee Did Not Limit "Queue Replenishment Control Rules" to Rules Requiring "Automatic Addition" of Titles to the Queue .................................... 16

C. The District Court Erred in Its Construction of "Authorized by the Subscriber" by Limiting This Term to an Embodiment Described in the Specification ................................................................. 18

II. THE DISTRICT COURT PROPERLY REJECTED APPELLEES' CLAIM THAT "NOTIFICATION RULES" AND "QUEUE REPLENISHMENT CONTROL RULES" ARE INDEFINITE ............... 21

A. A Person Skilled in the Art Would Understand the Bounds of the Claims by Reading the Prosecution History ........................................... 23

B. A Person Skilled in the Art Would Understand the Bounds of the Claims by Reading the Specification ................................................... 24

III. THE LOWER COURT'S FINDING OF NONINFRINGEMENT SHOULD BE REVERSED AND REMANDED FOR FURTHER PROCEEDINGS ........................................................................... 26

IV. THE DISTRICT COURT CORRECTLY REFUSED TO AWARD FEES TO NETFLIX BECAUSE THIS CASE IS UNEXCEPTIONAL UNDER ANY STANDARD .................................. 29

A. Netflix Does Not Challenge the District Court's Refusal to Find this Case Exceptional or Award Fees under Current Law ..................... 30

B. Netflix Waived the Right to Assert an Entirely New Legal Theory Seeking a Change in Law by Failing to Raise it Before the District Court ............................................................................... 33

C. Even if this Court Chooses to Change Current Law, the District Court's Fees Ruling Should be Affirmed Because this Case is Unexceptional Under any Standard ....................................................... 39

1. This Case is Unexceptional Under Netflix's Proposed
   Objective Recklessness Standard ....................................................39

2. Awarding Fees in This Case Would Not Vindicate Important
   Public Interests..............................................................................44

D. This Court Should not Revise Current Law Because it is
   Evenhanded and Consistent with Related Bodies of Law.....................48

1. Applying a Different Standard to Willful Infringement and
   Frivolousness Does not Create a Dual Approach Because the
   Underlying Conduct is Different ......................................................48

2. Current Law is in Harmony with Rule 11 .........................................51

3. Current Law is in Harmony with Other Areas of Intellectual
   Property Law..................................................................................53

4. Current Law Provides District Courts with Ample Discretion ........54

E. Netflix Must Raise this Issue Before Congress Rather than this
   Court, Because it Seeks to Remove the "Exceptional Case"
   Requirement from Section 285 for Prevailing Defendants ...................55

CONCLUSION...........................................................................................57

DECLARATION OF AUTHORITY...........................................................59

CERTIFICATE OF SERVICE .................................................................60

CERTIFICATE OF COMPLIANCE.........................................................62

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.,*
    393 F.3d 1378 (Fed. Cir. 2005) ............................................................*passim*

*Computer Docking Station Corp. v. Dell Inc.,*
    519 F.3d 1366 (Fed. Cir. 2008) ...........................................................42, 44

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
    460 F.3d 1349 (Fed. Cir. 2006) ..................................................................34

*Conopco, Inc. v. Campbell Soup Co.,*
    95 F.3d 187 (2d Cir. 1996) .........................................................................53

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005) ...........................................................21, 22

*Digeo, Inc. v. Audible, Inc.,*
    505 F.3d 1362 (Fed. Cir. 2007) ............................................................*passim*

*Eltech Systems Corp. v. PPG Industries,*
    903 F.2d 805 (Fed. Cir. 1990) ..............................................................*passim*

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001) ...........................................................21, 22

*Exxon Shipping Co. v. Baker,*
    128 S.Ct. 2605 (2008).................................................................................37

*Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) ...................................................................16

*Fogerty v. Fantasy, Inc.,*
    510 U.S. 517 (1994).............................................................................52, 53

*Forest Group, Inc. v. Bon Tool Co.,*
    590 F.3d 1295 (Fed. Cir. 2009) .......................................................31, 32, 35

*Forest Labs., Inc. v. Abbott Labs.*,
  339 F.3d 1324 (Fed. Cir. 2003) ........................................................32, 52, 53

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ...................................................................33

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)........................................................................................43

*Harris Corp v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ..................................................................33

*Haynes Int'l, Inc. v. Jessop Steel Co.*,
  8 F.3d 1573 (Fed. Cir. 1993) ................................................................32, 39

*Illinois v. Gates*,
  462 U.S. 213 (1983)....................................................................................37

*Informatica Corp. v. Bus. Object Data Integration, Inc.*,
  489 F.Supp.2d 1075 (N.D. Cal. 2007)........................................................35

*In re Gardner*,
  480 F.2d 879 (C.C.P.A. 1973).....................................................................24

*In re Seagate Technology, LLC*,
  497 F.3d 1360, 1371 (Fed. Cir. 2007) ...................................................49, 50

*In re Warmerdam*,
  33 F.3d 1354 (Fed. Cir. 1994) ....................................................................21

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ..................................................................37

*Janes v. Wal-Mart Stores Inc.*,
  279 F.3d 883 (9th Cir. 2002) ......................................................................34

*Jurgens v. CBK, Ltd.*,
  80 F.3d 1566 (Fed. Cir. 1996) ....................................................................49

*Lemelson v. General Mills,*
    968 F.2d 1202 (Fed. Cir. 1992) ....................................................... 14

*Lipscher v. LRP Publications, Inc.,*
    266 F.3d 1305 (11th Cir. 2001) ...................................................... 53

*Marley Mouldings Ltd. v. Mikron Indus., Inc.,*
    417 F.3d 1356 (Fed. Cir. 2005) ...................................................... 21

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995) ....................................................... 50

*Nilssen v. Osram Sylvania, Inc.,*
    528 F.3d 1352 (Fed. Cir. 2008) ...................................................... 50

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) .................................................. 6, 17

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys, Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) ...................................................... 18

*Stephens v. Tech Int'l, Inc.,*
    393 F.3d 1269 (Fed. Cir. 2004) ....................................... 32, 39, 40

*TP Labs., Inc. v. Prof'l Positioners, Inc.,*
    724 F.2d 965 (Fed. Cir. 1984) ....................................................... 42

*United States v. Carlson,*
    900 F.2d 1346 (9th Cir. 1990) ....................................................... 34

*Wedgetail, Ltd. v. Huddleston Deluxe, Inc.,*
    576 F.3d 1302 (Fed. Cir. 2009) ............................................... 29, 49

## Statutes and Rules

17 U.S.C. § 505 ................................................................................52

35 U.S.C. § 271 ................................................................................37

35 U.S.C. § 285 .......................................................................*passim*

35 U.S.C. § 112 ................................................................................21

Fed. R. Civ. P. 11 ...........................................................................51

# STATEMENT OF THE ISSUES

The issues presented by Netflix's cross-appeal are:

1.    (a) Should this Court prevent Netflix from avoiding the clear error standard of review owed to the district court's refusal to find this case "exceptional" under 35 U.S.C. § 285 because Netflix waived its argument for a new "exceptional case" standard by raising it for the first time on appeal?

(b) Do any facts in this case besides the outcome in the lower court justify an "exceptional case" finding under any conceivable 35 U.S.C. § 285 standard?

(c) Should this Court decline Netflix's invitation to redraft 35 U.S.C. § 285 without an "exceptional case" requirement for prevailing defendants?

## STATEMENT OF THE CASE AND THE FACTS

In its cross-appeal, Netflix asks this Court to remove the "exceptional case" requirement from 35 U.S.C. § 285 in an effort to justify attorney fees in this case. Before the district court, however, Netflix pursued an entirely different legal theory by vigorously arguing its entitlement to fees under current law. (A2324-28.) But the district court disagreed with Netflix's arguments and did not find the case exceptional. (A2558 at 25-27.) Although Netflix claimed that it "placed Media Queue on notice that its infringement contentions were not tenable" by submitting a letter brief previewing the arguments in its later summary judgment motion, (A2323 at 12-27), the court found that "the fact that the Court's claim construction ultimately resulted in a finding of non-infringement does not make Media Queue's claim retroactively baseless." (A2559 at 6-9.) Pointing to evidence showing that Media Queue seriously evaluated its claims prior to litigation, (A2558 at 13-28; A2559 at 1-4), the court found that Netflix was unable to prove "that Media Queue's claims were brought in bad faith or that the claims were objectively baseless." (A2558 at 25-27.) Now, in its cross-appeal, Netflix argues for a change in law for the first time.

## SUMMARY OF THE ARGUMENT

In support of their flawed constructions of critical claim terms, Netflix and

Blockbuster repeatedly attempt to create confusion in the specification where none

exists. Ignoring Media Queue's reasoned application of claim differentiation,

Netflix attempts to narrow the proper construction of "notification rules," "queue

replenishment control rules," and "authorized by the subscriber" by improperly

reading certain embodiments in the specification into the claims. When confronted

with other embodiments that do not support its construction, Netflix either attempts

to diminish them or ignores them altogether. Netflix's analysis of the prosecution

history contains similar flaws, because Netflix misinterprets the inventor's

statements and misapplies caselaw. Blocksbuster also attempts to distort the

specification's teachings in support of its indefiniteness argument, but it fails to

prove the claims insolubly ambiguous and ignores the perspective of one skilled in

the art. Thus, this Court should reverse the lower court's claim constructions and

adopt the constructions proposed by Media Queue. Because the lower court's

finding of noninfringement relied on those improper claim constructions, so too

should this Court reverse the lower court's summary judgment ruling.

In its cross-appeal, Netflix cannot justify the radical revision of 35 U.S.C. §

285 that it seeks. Although Netflix does not challenge the district court's refusal to

find this an "exceptional case" under current law, Netflix waived its right to seek a

change in the law by failing to raise this issue before the district court. But even if this Court allows Netflix to present this argument for the first time on appeal, this unexceptional case does not warrant the extraordinary remedy of attorney fees under any proposed standard. Moreover, regardless of the facts, Netflix's entire argument for a change in law rests on the fundamentally flawed premise that current law is not evenhanded. Because current law applies equally to plaintiffs and defendants after the court makes a finding on a variety of different types of underlying conduct, the change in law Netflix seeks would upset the balance, not restore it. Indeed, Netflix would have this Court remove the "exceptional case" requirement from 35 U.S.C. § 285 altogether for prevailing defendants as a punishment for nonpracticing plaintiffs. Because that decision is reserved for Congress, this Court should decline to redraft 35 U.S.C. § 285 and instead affirm the district court's denial of attorney fees.

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY CONSTRUING CRITICAL CLAIM TERMS TOO NARROWLY

The district court erred when construing the claim terms "notification rules,"

"queue replenishment control rules," and "authorized by the subscriber." To

derive proper constructions, Media Queue relies on sound principles of claim

construction, viewing the claims in light of the specification and the prosecution

history. Netflix, by contrast, improperly construes these claims by reading select

embodiments into the claims and misapplying caselaw to the prosecution history.

Because Netflix cannot justify its overly narrow construction of these terms, this

Court should reverse the lower court and adopt Media Queue's constructions.

### A. "Notification Rules" Should Not Be Limited to Notifications "About Queue Status"

Netflix seeks to improperly limit "notification rules" to support its overly

narrow view of the '243 patent. Notification rules are simply tools used by the

invention to set guidelines for how and when to contact a subscriber. As Netflix

admits, these rules are used in conjunction with queue replenishment control rules

to "monitor" the subscriber's queue. This "monitoring," in turn, covers a wide

range of activities that include some sort of notifying, alerting, informing, or

otherwise communicating with the subscriber. For example, various objects of the

invention require that the user be notified in a number of situations. (*See* A0046 at

3:10-21 (describing various systems that "alert[] and inform[] subscribers/ purchasers of the status of items in a rental/purchase queue," "provide intelligent feedback in response to such notifications," and "coordinate[] with a queue monitoring system, so that the subscribers/purchasers can enjoy the benefits of such system even during periods when they are not actively engaged with an online rental/purchase system").) Thus, notification rules broadly encompass "a set of rules governing the transmittal of notifications."

## 1. The Principle of Claim Differentiation Supports Media Queue's Construction of "Notification Rules"

Netflix does not dispute Media Queue's claim differentiation analysis, in which Media Queue contrasts the use of the term "notification rules" in unasserted claims 1 and 27 with its use in asserted claims 13 and 23. This claim comparison shows that when the inventor wanted to claim notifications strictly limited to "about queue status," he did so by unequivocally claiming notifications about the "status of the subscriber rental queue," (A0058 at 27:9-11), not by mere reference to "notification rules" generally. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Thus, the term "notification rules" should not be limited to only that particular type of notification.

Instead of refuting Media Queue's analysis, Netflix argues that despite the inventor's careful choice of claim terms and repeated admonitions that the examples in the specification were just that – examples – the specification should be treated as the sole embodiment and "trump" the words of the claims. (Netflix Br. 31.) But a search of the specification shows that Mr. Gross used the words "example" or "exemplary" more that 60 times in the twelve pages of the '243 patent's specification. What more could he do to show that the embodiment in the specification was only an example?

## 2. Notification Rules "For The Subscriber Rental Queue" are Not Limited to Notifications "About Queue Status"

Both asserted independent claims have "notification rules" "defin[ed] … for the subscriber rental queue" used in "monitoring the subscriber rental queue" in order to "send[] an electronic notification to the subscriber." (A0058 at 27:15-36; 28:15-26.) Netflix, however, attempts to replace an express limitation in the claims – "for the subscriber rental queue" – with an entirely different limitation unsupported by the specification – "about queue status." Netflix seems to be arguing that the words "for" and "about" have the same meaning. (Netflix Br. 26-27.) This is flatly untrue. A rule can be *"for"* the *use* of the queue without being *"about"* the *status* of the queue. Thus, the claim language indicates that the notification rules are "for the subscriber rental queue."

In support of this argument, Media Queue pointed to a notification rule used to determine whether to send any sort of notifications at all. (A0049 at 9:54-57.) Netflix tries to downplay this example by arguing that this portion of the specification allows the user not to receive a notification about queue status. (Netflix Br. 29.) As the inventor repeatedly admonished, however, the *example* being described in the specification was not intended to limit the claims, but was instead just an illustration of one possible embodiment of the invention.

Mr. Gross noted that the inventive system could be configured to be "passive" if the user decided to have limited interaction with the system. (A0046 at 7:46.) He went on to describe a series of possible options that could be presented to the user. One such option allowed the user to "skip any official notification to the subscriber" if that user "prefer[red] not to receive additional emails." (A0049 at 9:55-59.) Mr. Gross concluded this section by noting this description is "merely exemplary, and that any particular commercial implementation is likely to deviate from the same." (A0050 at 11:29-32.) Thus, the specification describes a flexible system with notification rules that allow the user to opt out of receiving notifications based on the user's preferences. The specification does not depict a system where notification rules refer to nothing more than queue status.

### 3. Netflix Either Ignores the Examples in the Specification or Takes the Examples Out of Context.

Media Queue pointed to an example in the specification where the user was sent a notification not pertaining to queue status, but Netflix again misinterprets the specification. (Netflix Br. 30.) The specification states:

> In this type of notice, a user is informed of the fact that a queue monitoring system has identified a title that he/she may be interested in, and a specific request for feedback is made to confirm acceptability of the choice.

(A0050 at 12:16-21). In this example, the notice informs the user of a title of interest, and the user is requested to confirm the "acceptability" of the recommended title. There is no limitation as to how the user provides this confirmation. It could be through the act of adding the title to the user's queue, or it could be done by allowing the user to rate the recommended title. Rather than accepting the words of the specification as plainly written, Netflix distorts this language by viewing it through the lens of the example email shown in Fig. 3B. That example, however, shows only one possible format for an email sent to a subscriber, and the inventor cautions that "[t]he precise format, wording and style will be a matter of design choice for any particular application and the invention is not limited to the same." (A0050 at 12:31-33.)

In another example from the specification, a notification rule allows the subscriber to "indicate how often he/she should receive notices." (A0049 at 9:48-

50.) Netflix makes no mention of this example in its briefing. However, a rule governing the frequency of notifications is not strictly "about queue status." Thus, the examples of the specification support Media Queue's view that notification rules should not be limited to notifications "about queue status."

Thus, for all of the foregoing reasons, a proper construction of notification rules does not include the limitation "about queue status." This Court should modify the district court's construction by deleting the erroneously inserted phrase, thereby changing the construction to "a set of rules governing the transmittal of notifications."

**B.    "Queue Replenishment Control Rules" Are Not Limited to Rules Regarding Automatic Addition of Titles to the Queue**

Netflix here again attempts to obscure Media Queue's arguments by taking words out of context and importing limitations from the specification. The lower court improperly narrowed "queue replenishment control rules" by limiting this term to (a) only addition of materials to the queue and (b) by requiring that addition to happen automatically. (A1106-08; A2080-83; A1834-38; A2156-60.) The correct construction is "a set of rules (distinct from the set of notification rules) governing the refilling of the subscriber's rental queue." This construction is supported by the specification, the claims, and the prosecution history.

### 1. The Specification Contemplates a Broad Construction of Queue Replenishment Control Rules

The specification supports a broad construction of "queue replenishment control rules." Although several examples were cited in Media Queue's Principal Brief, Netflix tries to dismiss these examples by (1) arguing that examples showing changes to order do not specifically use the word "replenishment" or (2) ignoring them altogether.

For example, the specification contemplates queue replenishment control rules related to the ordering of items in the queue. (A0048 at 8:61-67.) It also contemplates queue replenishment control rules related to determining the desirability of certain selections. (*Id.* at 8:42-56.) Netflix argues that these example relate to "changes in composition" and not replenishment. (Netflix Br. 37-38.) However, this argument is erroneous because the claims expressly use "notification rules" in conjunction with "queue replenishment control rules" to "determine if a composition of such rental queue should be altered through additions of playable media titles and/or ordering of playable media titles in the subscriber rental queue should be altered." (A0058 at 27:25-28; 28:22-25.) Thus, the claims expressly contemplate that changes to the composition of the queue would be informed by the application of "queue replenishment control rules."

Further, Netflix ignores examples from the specification showing non-automatic "queue replenishment control rules." For example,

Threshold Option #1 (default) of course is the least 'proactive' of course, but still serves to accomplish the goal of reducing the chances that the Subscriber Selection Queue 110 will become completely empty. ... **Thus, when the system detects that the last selection to be moved into Titles Out Queue 106 is less desirable than another selection that is available, the user can opt for the better selection to be shipped instead (either automatically, or through an email confirmation)**, thus avoiding a wasted shipment, wasted time, etc.

(A0048 at 8:42-56 (emphasis added).)  In this example, the fact that the queue can be altered automatically in one embodiment does not prevent another embodiment from merely notifying the subscriber of a title of interest. This "non-automatic" queue replenishment control rule allows the alteration to the queue to be performed by the subscriber. Netflix ignores these words and instead focuses on another option requiring automatic addition to the queue. (Netflix Br. 44.) However, this example unequivocally allows for either "automatic" shipment of an item or mere notification of the availability of that item. If the email confirmation option is selected, no change is automatically made to the subscriber's queue; instead, an email is merely sent to the subscriber alerting the subscriber to the title of interest.

Netflix also overemphasizes the importance of the word "computer." While the asserted claims require the "computer" to determine whether the queue should be altered, this does not mean that the computer must *automatically* alter a subscriber's queue. (*See* A0058 at 27:21; 28:20.) For example, "in some embodiments, the system may merely alert the subscriber to the queue deficiency." (A0051 at 14:6-7.) According to the patentee, "the primary advantage of the

present invention lies in the fact that, unlike the prior art systems, a subscriber is notified of the deficiency in his/her selection queue, and is thus given an opportunity to address the same in a prompt fashion." (A0050 at 12:36-38.) Thus, the specification discloses that the computer may determine the existence of an issue with the queue and – rather than altering the queue automatically – merely alerting the subscriber to the issue so that the subscriber may manually take the necessary steps to address the issue. As such, the use of a "computer" in claims 13 and 23 does not mean queue replenishment must happen automatically.

### 2. Netflix Continues to Misconstrue the Prosecution History by Asserting That Mr. Gross Narrowed the Definition of Queue Replenishment Control Rules during Prosecution

In his first office action response, Mr. Gross argued that the Hastings reference did not show replenishment. Netflix, however, misinterprets this response as limiting queue replenishment to addition of items to the queue. A review of the patentee's exact words shows that he felt replenishment was lacking because Hastings neither adds titles to the queue nor changes the order of items in the queue.

> In the Hastings system, as the Examiner notes, titles are taken out but there is no "replenishment" shown or suggested. … [I]t does not have the capability to determine if the "…composition of playable media titles in the subscriber rental queue should be altered through additions of playable media titles." Nor does Hastings show any mechanism for changing an "ordering" of titles in a queue; it remains precisely as before even if a DVD is moved into a delivered status.

(A0640-41 (emphasis in original).)  This statement in no way evidences a desire to exclude changes to order from the purview of "queue replenishment control rules." To the contrary, Mr. Gross explicitly stated that replenishment encompassed both ordering and addition of items.[1]  Netflix's convenient quotation of this language in its briefing skips over any mention of "ordering."  However, reading the full quote in context shows that he was in no way disclaimed changes to the order of items as a part of his invention.

Even if Netflix's version of events were to be accepted – that Mr. Gross had somehow argued that ordering was not a part of queue replenishment – it is still incorrect to argue that the term would be limited by such an argument.  Netflix misinterprets the prosecution history by misapplying *Lemelson v. General Mills*, 968 F.2d 1202 (Fed. Cir. 1992).  There, this Court held that a patentee could not return to his original position that the patent office found to be unpatentable; instead the patentee was required to stick with an interpretation of his claims that comported with the USPTO's understanding of the claims.  *Id.* at 1207-08.  Netflix argues that this case shows that a patentee cannot change from his original

---

[1] Netflix's brief seems to argue that Media Queue should be estopped from making arguments regarding ordering because its proposed definition contained the word "refilling." (Netflix Br. 36).  This position is disingenuous at best.  Media Queue has consistently argued that changes to order are part of the queue replenishment control rules. (*See, e.g.*, A1108 at 6-10.)  This argument is in no way a change of course for Media Queue, which has always argued that rules related to refilling a queue would encompass rules regarding changes to order of items in the queue.

position, when in fact *Lemelson* stands for something completely different.
(Netflix Br. 39 n. 1.)

> Lemelson cannot acquiesce to a rejection and to an agreed alternative, and now years later shift his stance 180° to argue for a second bite at the abandoned apple. Other players in the marketplace are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent.

968 F.2d at 1207-08.  In other words, it is not the patentee's original position that matters, but rather the position which the patentee acquiesced to before the PTO to advance the prosecution.  In the instant case, the '243 patent issued with the understanding that Hastings had queue replenishment control rules, and thus, it is completely proper for the marketplace – including Media Queue – to argue that Hastings has queue replenishment control rules.  Under *Lemelson,* it would be improper for Media Queue to now argue for a position abandoned after the very first office action response.  Thus, Media Queue should be allowed to rely on the PTO's view that queue replenishment control rules include changes to the order of items in the queue as contemplated by Hastings.

### 3. The District Court Ignored the Plain Meaning of "Can" And Interpreted That Word to Mean "Must" in the Context of Allowing Automatic Features to Be a Part of Queue Replenishment Control Rules

In yet another effort to limit the claims to automatic addition, Netflix misinterprets the plain meaning of the patentee's words during prosecution.  Mr. Gross noted that his invention was one "in which a user **can** set up a set of rules

which automatically cause a modification to a subscriber rental queue." (A0640 (emphasis added).) The plain meaning of "can" indicates that Mr. Gross was discussing a mere capability of the system, not a requirement. Netflix argues that even if it is just a capability, that capability must be part of the meaning of the term. However, there is no requirement that each and every capability of an invention be captured in each and every claim of a patent. *See, e.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004) ("[I]t is improper to read a limitation from the specification into the claims."). Certain claims are directed to the automatic features and capabilities found in the system. (*See e.g.*, A0057-58 at 26:10-27:14.) Indeed, Media Queue does not dispute that automatic features are a part of this invention. Where the dispute lies is in the question as to whether automatic features are the only invention disclosed in the '243 patent. The specification shows that automatic features are but one aspect of this invention and not the entirety of the '243 patent.

### 4. Claim Differentiation Shows that the Patentee Did Not Limit "Queue Replenishment Control Rules" to Rules Requiring "Automatic Addition" of Titles to the Queue

Here again, Netflix does not dispute Media Queue substantive analysis regarding claim differentiation. After comparing asserted claims 13 and 23 with unasserted claims 1, 2, 4, 14, and 27, Media Queue showed that an unasserted claim had additional language requiring that the user be presented with "a first

choice to automatically trigger a modification of the subscriber rental queue, and a second choice which does not trigger a modification of the subscriber rental queue." (A0057 at 26:28-34.) This language is strikingly similar to the lower court's interpretation of the automatic aspects of "queue replenishment control rules."

> Although a subscriber may choose not to benefit from the automatic queue replenishment feature, the subscriber still has to be presented with this option, and a computer must determine whether the subscriber has selected this option. In other words, the feature of determining whether to automatically replenish media titles is an essential element of the claimed invention, not merely an optional feature.

(A0020.) Thus, the lower court's construction improperly imposed the limitations of Claim 1 on each and every claim that had "queue replenishment control rules," despite the patentee's use of distinct language in the other claims. *See, e.g., Phillips*, 415 F.3d at 1314-15 (discussing claim differentiation). Netflix does not raise a single argument in dispute of this analysis; instead, Netflix argues that despite the differences in language, the patentee really meant to say the same thing in each of these claims. However, this position is contradicted by the language of the claims and the specification.

Thus, for all of the foregoing reasons the court erred in its construction of queue replenishment control rules. A proper construction of this term would not limit this term to addition or any sort of automatic feature. Therefore, the correct

construction is "a set of rules (distinct from the set of notification rules) governing the refilling of the subscriber's rental queue."

## C.     The District Court Erred in Its Construction of "Authorized by the Subscriber" by Limiting This Term to an Embodiment Described in the Specification

The lower court's construction of "authorized" is impermissibly narrow. There is no reason to limit this term to an election from multiple options. Instead, this term should be given its plain meaning of "permitted or sanctioned by the subscriber."

In an effort to support a narrow definition of "authorized," Netflix tries to shoehorn the '243 patent into a situation analogous to *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001). There, the patent at issue contained language expressly limiting the invention to a particular set of features. *Id.* at 1343 (describing the particular feature as applying to "all embodiments of the present invention contemplated and disclosed herein"). Netflix argues that because the specification mentions that the "Queue Control Option display area **115** is unique to the present invention," the entire invention is limited to this single embodiment. (Netflix Br. 49; A0047 at 6:42-43.) This argument is flawed. Just because a particular aspect of the specification is unique to an invention does not mean that aspect is the entirety of the invention. In *SciMed*, the patentee made the clear and unequivocal statement that "all

- 18 -

embodiments of the present invention" had a particular feature. 242 F.3d at 1344. There is no such statement in the '243 patent. Nor is there any support for requiring that each and every claim of the patent contain that particular aspect.

Netflix misinterprets other portions of the specification as well. Netflix cited language from the specification noting that a drawback of the prior art was that those systems failed to provide subscribers with "any flexible degree of control over their rental selection queue or shipments." (Netflix Br. 47.) This portion of the specification is taken out of context because it deals with control over features such as shipment of items. (A0045 at 2:19-26 ("For example, subscribers are not given an option of whether a particular title in the rental queue should be shipped; it is automatically shipped, even if they may have changed their minds.").) Claims 13 and 23, by contrast, use "authorize" in the context of the subscriber authorizing the queue replenishment control and notification rules. Thus, the specification's mention of flexible control over shipments in no way limits the claim term to the election of an option from a choice of options.

Netflix also points to language in the specification allowing subscribers "to define policies and rules to be used in determining what actions should be taken with respect to particular items." (Netflix Br. 48.) This language in no way limits the invention to a system where the subscriber must authorize choices by making a selection from multiple options. It is unclear how Netflix came to the conclusion

that a rule could only be defined by allowing the subscriber to select the rule from multiple options. A rule defined by the subscriber could be created in any number of different ways, and the specification does not seek to limit the subscribers' choices; instead, wide ranging choices for the subscriber are emphasized and encouraged.

In that vein, the specification includes examples showing rules that are authorized by means other than the election of an option from a group of options. For example, Fig. 2 depicts an embodiment where the subscriber is allowed to pick a number directed to either the number of items in a queue that would trigger review of that queue or the number of days that should go by before the subscriber's queue is reviewed. (A0035.) In both of these options, a subscriber is allowed to freely enter a number into the system and is not presented with a choice of possible options.

Thus, for all of the foregoing reasons the district court erred in its construction of "authorized by the subscriber." This term should be given its ordinary meaning and as such, it should be construed as "permitted or sanctioned by the subscriber."

## II.  THE DISTRICT COURT PROPERLY REJECTED APPELLEES' CLAIM THAT "NOTIFICATION RULES" AND "QUEUE REPLENISHMENT CONTROL RULES" ARE INDEFINITE

The district court rejected Appellees' arguments that the terms "notification rules" and "queue replenishment control rules" are indefinite, finding both terms "amenable to construction." (A0014 at 11-15; A0017 at 12-16.) Now, to hedge their bets against adverse claim construction rulings by this Court, Appellees once again argue in the alternative that these claim terms are indefinite. Because Appellees cannot show by clear and convincing evidence that "reasonable efforts at claim construction [would] prove futile," *see Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed. Cir. 2001), this Court should affirm the district court's finding that the terms of the '243 patent are not indefinite.

35 U.S.C. § 112, ¶ 2 requires that a patent's specification have "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The legal standard for definiteness is whether a claim reasonably apprises those of skill in the art of its scope." *In re Warmerdam,* 33 F.3d 1354, 1361 (Fed. Cir. 1994). This standard is satisfied if "one skilled in the art would understand the bounds of the claim when read in light of specification." *Exxon Research,* 265 F.3d at 1375; *see also Marley Mouldings Ltd. v. Mikron Indus., Inc.,* 417 F.3d 1356, 1359 (Fed. Cir. 2005). Absolute clarity is not required; rather, indefiniteness is present only when "a claim is ***insolubly ambiguous***." *Exxon Research,* 265 F.3d at 1375 (emphasis added); *see also Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed. Cir. 2005).

- 21 -

Proving indefiniteness is no small feat. Because issued patents are entitled to a presumption of validity, indefiniteness must be shown by clear and convincing evidence. *Datamize,* 417 F.3d at 1347-48. Moreover, a claim is not indefinite merely because it is subject to more than one reasonable interpretation. *Exxon Research,* 265 F.3d at 1375. Nor is a claim indefinite merely because it poses a difficult issue of claim construction. *Id.* If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, the claim is sufficiently clear to avoid invalidity on indefiniteness grounds. *Id.* By finding claims indefinite only if reasonable efforts at claim construction prove futile, respect is given to the statutory presumption of patent validity, and the inventive contribution of patentees is protected. *Id.*

Although definiteness is measured from the perspective of one skilled in the art, Appellees did not provide the district court with a supporting declaration from any such person, choosing to rely solely on mere attorney argument instead. Appellees continue to assert the same bare argument before this Court, but in so doing, Appellees fail to explain why one skilled in the art cannot understand the bounds of the invention, fail to acknowledge the clear guidance given in the prosecution history about the scope of the claims, and create confusion about the specification's disclosure where none exists.

## A.    A Person Skilled in the Art Would Understand the Bounds of the Claims by Reading the Prosecution History

As an initial matter, the Examiner, a person of ordinary skill in the art, thoroughly examined the patent application during prosecution. In six office actions, the Examiner did not find these terms indefinite.[2] (*See, e.g.*, A1475-83; A1486-94; A1497-509.) To the contrary, the Examiner was able to conclude that the prior art Netflix patent to Hastings et al. disclosed "queue replenishment control rules," but did not disclose "a set of notification rules." (A1480; A1488.) The Examiner's application of these claim terms to the prior art Netflix system and other prior art provides meaningful guidance on the scope of these terms. By articulating reasons for finding various elements of the claims in the prior art – all of which were ultimately traversed – the Examiner provided guidance on the meaning of the claims and illustrated that a person of skill in the art could understand the disputed terms.

The prosecution history provides further evidence of the patent's clarity. The inventor submitted a Petition to Make Special and Supporting Declaration to accelerate the prosecution, which included a claim chart explaining how and why Blockbuster infringed one of the claims in the original application. (A1467-69.)

---

[2] Notably, Netflix apparently did not find these terms indefinite during prosecution either. In the Declaration authored by Netflix and submitted to the PTO claiming that Netflix's alleged prior art system invalidated the pending claims in the '243 patent application, Netflix did not indicate that these terms were indefinite. (*See* A1156-66.)

This submittal provides additional guidance to one skilled in the art about the boundaries of a "notification rule" and a "queue replenishment control rule." Indeed, the claim analysis in that January, 2005 chart is nearly identical to the claim analysis applied against Appellees' accused systems in this litigation. Appellees fail to explain why this key evidence in the prosecution history would not illuminate the meaning of these terms to a person skilled in the art.

**B.     A Person Skilled in the Art Would Understand the Bounds of the Claims by Reading the Specification**

Appellees' suggestion that the specification is so confusing as to make reasonable efforts at claim construction futile is without merit. Appellees first complain that the specification refers to various "options" and "parameters" but not rules.[3] This argument, however, aims to create confusion where none exists. Claims 13 and 23, the claims at issue, refer to sets of rules that are defined by the *operator* of the system to control its operation. The portions of the specification cited by Appellees, by contrast, focus on what a *subscriber sees* when interacting with that system. In other words, while there are defined notification and queue replenishment control rules that are implemented by the operator using the claimed methods, certain embodiments in the '243 patent are directed to subscriber interfaces that present "options" and "parameters" that can be selected by

---

[3] Because the original claims are part of the specification, *In re Gardner*, 480 F.2d 879, 879 (C.C.P.A. 1973), Appellees' assertion that "the specification never mentions the terms" is plainly incorrect. (Blockbuster Br. 14.)

subscribers. The options and parameters (selected by subscribers) are related to the underlying notification and queue replenishment control rules (defined by the system operator) in ways that are well understood by persons of ordinary skill in the art.

Appellees correctly point to Fig. 2, (A0035), and the associated description in the specification for guidance on the meaning of the "rules" terms. The specification and asserted claims make it clear to a person skilled in the art that there are both notification and queue replenishment control rules, and that the system will monitor the subscriber rental queue in accordance with these rules. As such, it is not surprising that the specification intertwines its description of the monitoring, replenishment, and notification functionality. In addition, the specification makes abundantly clear that the options discussed are merely exemplary and that some options are more proactive in preventing the queue from running dry than others. (A0047 at 6:41-59; A0048 at 7:44-46.)

Moreover, a person of skill in the art can easily determine what parts of Fig. 2 relate to notice and what parts relate to replenishment. For example, box **220** relates to the monitoring and replenishment of the rental queue because it describes a trigger event that is used in the monitoring of the queue for replenishment purposes. It does not relate to notification. Furthermore, the fact that box **220** relates to replenishment does not preclude other boxes – like box **240** – from

relating to replenishment as well. Nor does the fact that box **230** relates to notification – the type of notifications that should or should not be sent when box **220** determines it is time to replenish the queue[4] – prevent box **230** from also relating to replenishment, depending on the options selected. Merely describing the two sets of rules as "separate" does not prevent an operator from using both types of rules to implement a given subscriber option. And despite Appellees' claims to the contrary, figuring out what underlying rules correspond to each option is simply not a difficult task.

Because Appellees fail to provide clear and convincing evidence that the claims are insolubly ambiguous, this Court should affirm the district court's finding that these claims are not indefinite.

## III.    THE LOWER COURT'S FINDING OF NONINFRINGEMENT SHOULD BE REVERSED AND REMANDED FOR FURTHER PROCEEDINGS

The lower court's finding of noninfringment should be reversed and remanded for further proceedings in light of the changed claim construction. Media Queue does not assert, nor has it ever asserted, that Netflix would infringe under the lower court's claim constructions currently under appeal.

---

[4] Appellees incorrectly assert that "Notification Option #3" does not relate to notification because selection of this option by the subscriber stops official notification. (Blockbuster Br. 15.) An option governing whether or not to send notifications, however, plainly relates to notification.

That construction required limitations to be present that all parties agree are not found in Netflix's system, such as the automatic addition of items to a subscriber's queue. For each of the alleged "queue replenishment control rules" in Netflix's system, the lower court held that they did not infringe because those features lacked automatic addition. (A0025 at 17-21; A0026 at 15-17; A0027 at 1-5.) Thus, if this Court removes the automatic addition limitation from the construction of queue replenishment control rules, it becomes an open issue for the trial court to determine whether these features would be able to meet the requirements of the new construction.

As to "notification rules," the trial court at minimum declined to rule upon the objection to Media Queue's evidence regarding "Netflix News." (A0027 at n.9). Thus, whether Netflix News constitutes a notification rule is an open question that was never decided by the trial court. The court declined to make a decision as to that issue because summary judgment could be found based on the lack of queue replenishment control rules. Therefore, there is no decision for this Court to affirm or reverse regarding Netflix News. At the hearing, the court allowed argument regarding Netflix News and indicated that, if necessary, briefing could be submitted regarding the admissibility of this particular evidence. (A2196.) No such briefing was ever filed, and no decision was made on this point. Thus, an open issue remains regarding whether Netflix News is a notification rule,

and this issue should properly be put before the trial court for any additional briefing and/or argument that the court may require before making its initial ruling.

Further, the rest of Netflix's alleged "notification rules" were also found not to infringe on the basis of claim construction issues that are disputed in this appeal. For example, the Netflix Terms of Service was found not to be a notification rule because it did not meet the requirements of being "authorized by the subscriber" because the subscriber was not offered a choice from multiple options. (A0023 at 22-25.) The other accused notification rules were found not to infringe because they were not "about queue status." (A0024 at 22-27.)

Netflix belatedly attempts to argue for noninfringement based on other portions of the asserted claims. (Netflix Br. 33.) However, these issues were never presented in the trial court. Netflix's noninfringement argument centered on the three terms at issue in this appeal, and Netflix did not raise arguments regarding any other aspects of the claims. Thus, none of those aspects are properly before this Court. Importantly, because Media Queue did not move for summary judgment of infringement, Media Queue did not have the burden of proving the existence of all claim limitations. Instead, as the non-movant, Media Queue was only required to rebut the noninfringement arguments raised by Netflix.

This Court should also reverse the district court's finding that Blockbuster does not infringe the asserted claims. Blockbuster merely argues its view of the

facts to support its claims of noninfringement, but the district court did not make any factual findings relevant to Media Queue's proposed constructions. Instead, the court found that "[i]n view of this factual dispute, ... summary adjudication on the issue of whether Blockbuster's accused feature constitutes the claimed notification rules is inappropriate." (A0030 at 5-6.) Because the district court found noninfringement solely for the lack of queue replenishment control rules that "must govern whether to automatically add media titles to the subscriber's rental queue" (A0029 at 8-11; A0031 at 3-7) – an improperly narrow construction that Media Queue challenges in this appeal – this Court should reverse the finding that Blockbuster does not infringe.

Thus, if this Court changes the claim construction the issue of infringement should be remanded to the lower court for further proceedings.

## IV.  THE DISTRICT COURT CORRECTLY REFUSED TO AWARD FEES TO NETFLIX BECAUSE THIS CASE IS UNEXCEPTIONAL UNDER ANY STANDARD

Under the American Rule, litigants generally must bear their own attorney fees. *Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009). 35 U.S.C. § 285, however, provides a narrow statutory exception to the rule in patent infringement cases, allowing reasonable attorney fees to the prevailing party in "exceptional cases." As the district court correctly found when denying attorney fees, Media Queue's patent infringement suit – though unsuccessful –

simply did not justify the exceptional remedy of Section 285, finding that "the fact that the Court's claim construction ultimately resulted in a finding of non-infringement does not make Media Queue's claim retroactively baseless." (A2559.) Netflix, however, effectively asks this Court to legislate from the bench and remove the "exceptional case" requirement from Section 285, opening the door for prevailing defendants to recover attorney fees after successful defense of any patent infringement suit.

The plainly unexceptional nature of this case illustrates both the breadth of Netflix's position and the inappropriateness of this case to define the boundaries of Section 285. Unless this Court redrafts Section 285 and wholly ignores the plain meaning of "exceptional," any new standard crafted by this Court will have no effect on the district court's ruling. Moreover, Netflix's entire argument rests on a mischaracterization of Section 285. Contrary to Netflix's suggestion, the statute as applied puts plaintiffs and defendants on equal footing, making either party equally eligible for attorney fees after the court makes a finding on a variety of vastly different types of underlying conduct.

## A.     Netflix Does Not Challenge the District Court's Refusal to Find this Case Exceptional or Award Fees under Current Law

Netflix does not challenge the district court's refusal to find this case exceptional under current law. Indeed, given the substantial interaction with Netflix prior to the issuance of the patent, the significant prefiling investigation

performed by Media Queue, and the clear error standard of review owed to the

district court's "exceptional case" determination, *see Forest Group, Inc. v. Bon*

*Tool Co.*, 590 F.3d 1295, 1304 (Fed. Cir. 2009), such an appeal would likely be

futile. Because Netflix did not argue its entitlement to attorney fees under current

law in its opening brief, (*see* Netflix Br. 69 (claiming only that "[t]he instant case

satisfies both of the *proposed* tests) (emphasis added)), Media Queue does not

address it, except to outline the current Section 285 standard applied by the district

court when it denied fees.

Under current law, "[a] case may be deemed exceptional when there has

been some material inappropriate conduct related to the matter in litigation, such as

willful infringement, fraud or inequitable conduct in procuring the patent,

misconduct during litigation, vexatious or unjustified litigation, conduct that

violates Fed. R. Civ. P. 11, or like infractions." *Brooks Furniture Mfg. v. Dutailier*

*Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). "Absent misconduct in conduct

of the litigation or in securing the patent, sanctions may be imposed against the

patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the

litigation is objectively baseless." *Id.* "A frivolous infringement suit is one which

the patentee knew or, on reasonable investigation, should have known, was

baseless." *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir.

1993) (citing *Eltech Systems Corp. v. PPG Industries*, 903 F.2d 805 (Fed. Cir.

1990)); *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1369 (Fed. Cir. 2007) (quoting

*Haynes*); *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1273-74 (Fed. Cir. 2004)

(quoting *Haynes*); *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1330 (Fed.

Cir. 2003) (quoting *Haynes*).[5]

Because "[t]here is a presumption that the assertion of infringement of a

duly granted patent is made in good faith[,] . . . the underlying improper conduct

and the characterization of the case as exceptional must be established by clear and

convincing evidence." *Id.* at 1382. "Even for an exceptional case, the decision to

award attorney fees and the amount thereof are within the district court's sound

discretion." *Id.* Thus, this Court reviews "a denial of attorney fees under 35

U.S.C. § 285 for an abuse of discretion, but the antecedent determination of

whether the case is exceptional is a question of fact [reviewed] for clear error."

*Forest Group*, 590 F.3d at 1304.

---

[5] Given this Court's continued reliance on the *Haynes* standard ("knew or, on reasonable investigation, should have known") as illustrated by *Forest Labs., Stephens,* and *Digeo,* Netflix misinterprets current law as requiring proof that "the plaintiff must *actually* know" the case lacked an objective basis. (*See* Netflix Br. 56 (emphasis in original).) Even if Netflix's understanding of current law were correct, the district court applied the *Haynes* standard in denying fees in the instant case. (A2559.)

**B.    Netflix Waived the Right to Assert an Entirely New Legal Theory Seeking a Change in Law by Failing to Raise it Before the District Court**

Netflix strenuously argued the exceptionality of this case under current law before the district court.  Netflix did not apprise the court of any perceived conflict in current law, nor did it advocate for a change in the law. [6]  Only now, in the face of the district court's refusal to find this case exceptional – a factual finding reviewed by this Court for clear error – does Netflix advance a new legal theory entirely divorced from its position below.  Because the Supreme Court, Federal Circuit, and the Ninth Circuit respect a lower court's prior reasoned consideration of issues, Netflix waived its claim that courts should apply a different standard for 35 U.S.C. § 285 by failing to raise it below.

As an initial matter, Federal Circuit law should govern the issue of waiver here because the claim waived – a new section 285 standard – is unique to patent law.  *See Harris Corp v. Ericsson Inc.*, 417 F.3d 1241, 1250-51 (Fed. Cir. 2005) (finding waiver of claim construction arguments governed by Federal Circuit law because claim construction is "indisputably unique to patent law").  In the Federal

---

[6] Netflix cannot claim to have raised this issue simply by quoting from *Eltech*.  A bare reference to *Eltech* – a case that has never been overruled – is plainly insufficient to notify the district court that Netflix seeks a change in current law.  Indeed, the district court applied this very proposition in denying fees to Netflix. (A2559 (quoting *Stephens*).)  Moreover, if this language contradicts current law in any way, one wonders why this Court has cited that language as recently as 2007.  *See Digeo*, 505 F.3d at 1369.

Circuit, the general rule is "that a federal appellate court does not consider an issue not passed upon below." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). "'[P]rudential considerations' articulated by the Supreme Court counsel against hearing new arguments for the first time on appeal absent limited circumstances." *Id.* at 1323. Netflix cannot argue that any of those limited circumstances – subsequent change in law, correct law not applied below, or pro se parties, *id.* – are present in this case. Moreover, waiver is not limited to questions of fact. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006) ("[L]egal issues in patent infringement suits are not immune to the doctrine of waiver on appeal. . . .").

But even if Ninth Circuit law applies as advocated by Netflix, this Court should decline to hear Netflix's newly conceived legal theory. As with the Federal Circuit, the Ninth Circuit's "general rule is that [it] will not consider issues raised for the first time on appeal." *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). That general rule, moreover, is subject to only a few "narrow exceptions":

> [W]e may consider an issue raised for the first time on appeal if (1) there are "exceptional circumstances" why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law *and the opposing party will suffer no prejudice* as a result of the failure to raise the issue in the trial court.

*Id.* (emphasis added); *see also Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002) ("[W]e may consider an issue not raised below if the issue is purely one of law, does not affect or rely upon the factual record developed by the parties, and will not prejudice the party against whom it is raised."). This case falls within none of those limited exceptions to the general rule. Nothing prevented Netflix from raising this issue in the trial court, and there has been no intervening change in law. Furthermore, the proper application of section 285 in this case is not "purely one of law," because regardless of the standard applied, the "determination of whether the case is exceptional is a question of fact." *See Forest Group*, 590 F.3d at 1304.

Even if this were a pure question of law, Media Queue has been prejudiced by Netflix's failure to raise this issue before the trial court. Whether or not a case is exceptional is a question of fact. *Id.* By not raising this issue in its fees motion, Netflix prevented the district court from making additional factual findings that would have simplified or eliminated this entire cross-appeal. If Netflix had raised this novel theory below, it is entirely likely that the court would have made additional factual findings – such as whether the case would be exceptional under the proposed standard – that would have informed Media Queue's arguments and aided this Court on appeal. Moreover, an exceptional case finding is only the first step under Section 285. In close cases, a district court might reach the second step

- 35 -

of the inquiry – whether the court would award fees in its discretion – even if it does not find the case exceptional. *See, e.g.*, *Informatica Corp. v. Bus. Object Data Integration, Inc.*, 489 F.Supp.2d 1075, 1086 (N.D. Cal. 2007) ("Even if it were deemed exceptional . . . an award of attorneys fees is not appropriate here."). Given the plainly unexceptional nature of the instant case, the district court did not even bother to reach the second prong of the analysis. If Netflix had raised this theory before the court, it is likely that the court would have made additional findings regarding its discretion to award fees. Netflix's complete failure to present this issue below prejudices Media Queue by foreclosing the benefit of those findings, effectively allowing Netflix to reargue factual issues already considered by the district court.

Netflix's tactics further prejudice Media Queue and waste judicial resources by increasing the time between a future exceptional case determination by the district court and the time when the district court knew this case best. Without question, the district court was most familiar with the facts of this case when it ruled on summary judgment in December, 2009, and when it declined to find this case exceptional in March, 2010. If this Court ultimately decides to hear this issue, adopts Netflix's proposed standard, and remands, more than a year will likely pass before the district court revisits this case. This Court reviews exceptional case findings for clear error precisely because of the district court's familiarity with the

facts, but memories fade, and clerks change. By waiting until now to raise this issue, Netflix forces the district court to waste precious resources relearning this case, and prejudices Media Queue by making the very facts that made this case unexceptional in the court's eyes more distant.

Netflix cannot downplay its failure to raise its novel legal theory before the district court by characterizing it as simply another "argument" in support of its "claim" for attorney fees under Section 285. To assert that the wholesale revision of section 285 that Netflix now seeks is merely an argument and not an entirely new issue strains credulity.[7] Indeed, from this lofty level of generality, Netflix could raise any challenge to Section 285 for the first time on appeal – whether it be constitutional, statutory, factual, or otherwise – simply because Netflix previously sought fees under Section 285 in the district court.

This Court's treatment of waiver in the claim construction context further reinforces this conclusion. Just as a party cannot advance new claim constructions

---

[7] The Supreme Court has rejected such overly broad definitions of claims. *See Illinois v. Gates*, 462 U.S. 213, 222-23 (1983) (refusing to consider a new argument seeking modification of the exclusionary rule because "[t]he application of the exclusionary rule [by the lower courts] was merely a routine act . . . and not the considered judgment of the Illinois courts on the question of whether application of a modified rule would be warranted on the facts of this case."); *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2618 (2008) ("If 'statutory preemption' were a sufficient claim to give Exxon license to rely on newly cited statutes anytime it wished, a litigant could add new constitutional claims as he went along, simply because he had 'consistently argued' that a challenged regulation was unconstitutional.").

on appeal merely because it raised a claim of infringement under 35 U.S.C. § 271,

*see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed.

Cir. 2001), neither can Netflix put forth an entirely novel legal theory simply

because it raised a claim for fees under 35 U.S.C. § 285. Netflix is not "proffering

additional or new supporting arguments, based on evidence of record," *id.* at 1347,

such as new arguments showing baselessness or bad faith, in support of its prior

position. Instead, Netflix "changed the scope" of its claim entirely by abandoning

its existing theory and offering a new and distinct theory based on proposed law on

appeal. As this Court has warned,

> [a] party's argument should not be a moving target. The argument at
> trial and appellate level should be consistent, thereby ensuring a clear
> presentation of the issue to be resolved, an adequate opportunity for
> response and evidentiary development by the opposing party, and a
> record reviewable by the appellate court that is properly crystallized
> around and responsive to the asserted argument.

*Id.* (quoting *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir.

1999)). Netflix, however, failed to heed that warning. In its attempts to skirt the

ramifications of adverse district court findings, Netflix waived its right to raise this

novel legal theory by waiting until now to unveil it. Because no special

circumstances warrant an exception to the general rule of waiver here, this Court

should decline to consider Netflix's argument.

**C.  Even if this Court Chooses to Change Current Law, the District Court's Fees Ruling Should be Affirmed Because this Case is Unexceptional Under any Standard**

Even if this Court overlooks Netflix's waiver, this cross-appeal is just an elaborate distraction from the merits of Media Queue's appeal because this case is truly unexceptional under any standard.  Indeed, the facts of this case illustrate that Netflix's question of supposedly "exceptional importance," the precise standard for an exceptional case under Section 285, is of decidedly limited importance to Media Queue.  Short of this Court usurping Congress' role by writing the statutory requirement of an "exceptional case" out of Section 285, the district court's ruling should be affirmed under any formulation.  Thus, although Netflix cannot justify the change in law that it seeks, the proposed change in law is insufficient to render this case exceptional.

**1.  This Case is Unexceptional Under Netflix's Proposed Objective Recklessness Standard**

In its pursuit of its proposed objective recklessness standard, Netflix criticizes current law as "a significant departure from prior case law," then quotes approvingly from *Eltech.* (Netflix Br. 55 n.6.)  Amici Internet Retailers likewise praise *Eltech* as a "laudable statement of principle." (Amici Internet Br. 6.)  But if Netflix seeks only the application of *Eltech* in its cross-appeal, the most efficient disposition of this issue is through a simple reading of the district court's opinion.  In its order, the district court plainly states:

"A frivolous infringement suit is one which the patentee knew, *or on reasonable investigation should have known*, was baseless." *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1273-74 (Fed. Cir. 2004).

(A2559 (emphasis added).) Not only does this language flatly contradict Netflix's characterization of current law, (*see* Netflix Br. 55 ("[T]he plaintiff must *actually* know it.") (emphasis in original)), the cited proposition finds its origins in *Eltech* itself. *See Haynes*, 8 F.3d at 1579 (citing *Eltech* in support of the quoted language); *Eltech*, 903 F.2d at 810 ("A party confronted with the difficulty of proving what is in an adversary's mind must be at liberty to prove facts establishing that that adversary should have known . . . ."). Because Netflix cannot show clear error in the court's refusal to find this case exceptional under *Eltech*, there is no reason to debate its applicability.

Indeed, to the extent Netflix's proposed objective recklessness standard is nothing more than the objective prong of existing law, the district court has already considered this argument and refused to find this case exceptional.[8] In describing its proposed standard, Netflix states that an award of fees should be justified "so long as a reasonable person would have found those arguments weak," (Netflix Br. 68), or if there was "an obvious, objectively low probability that plaintiff would succeed." (*Id.* at 69.) Yet, in its order denying fees to Netflix, the district court

---

[8] The court found that Netflix failed to prove either the subjective or objective prong of current law. (*See* A2558 (finding that Netflix did not prove that "Media Queue's claims were brought in bad faith *or* that the claims were objectively baseless") (emphasis added).)

evaluated the objective prong using *Stephens*, 393 F.3d at 1273-74 (asking whether "the patentee knew, or on reasonable investigation should have known, [the suit] was baseless"), and concluded that "the fact that the Court's claim construction ultimately resulted in a finding of non-infringement does not make Media Queue's claim retroactively baseless." (A2559.) Because Netflix cannot show clear error in the district court's refusal to find that Media Queue should have known its claims were baseless, the court's denial of fees should be affirmed.

Moreover, the record reveals the plainly unexceptional nature of this case under any standard. Nicholas Gross, a Netflix customer frustrated with the limited functionality in its movie rental service, invented several key improvements now claimed in the asserted patent. Prior to both the issuance of the patent and the start of this litigation, however, Mr. Gross and Netflix engaged in serious and protracted interplay over his invention. After developing his invention, Mr. Gross negotiated with Netflix to license or purchase his improvements. (A2396-97.) When negotiations broke down, Netflix authored a declaration to the PTO stating that Mr. Gross' invention was anticipated by the Netflix system, (A2401), a position that Netflix maintains today. (Netflix Br. 70-71.) Yet, the PTO examiner rejected those arguments. (A2415-36.) Mr. Gross also filed a petition to make special in which he accused Defendant-Appellee Blockbuster of infringing his yet to be issued patent. (A2438-40.) Not only was the petition accepted by the PTO, resulting in

expedited prosecution of Mr. Gross' application, (A2442-43), but those allegations

are largely similar to those advanced in this very litigation. Ultimately, Mr. Gross

sold his patent rights to Media Queue. (A2387.) Before purchasing and asserting

the patent, however, Media Queue noted its long history with Appellees and

thoroughly evaluated it. (A2387-88.) As the court found, Media Queue

"submitted evidence showing that it 'engaged in a serious effort to evaluate the

likelihood of success on its patent claims.'" (A2558-59 (citing *Computer Docking

Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1380 (Fed. Cir. 2008)).)

However, even if this Court chooses to ignore this substantial pre-suit

investigation, Media Queue's substantive arguments are still strong enough to

stand by themselves. In its ruling, the district court rejected Netflix's

indefiniteness arguments, (A0012-14), and repeatedly adopted claim constructions

between the parties' proposals. (A0016 at 14-15 ("[W]hile plaintiff's construction

is overly broad, defendants' construction is too narrow")); (A0018 at 16-17.)

Moreover, Media Queue has raised significant challenges to the district court's

claim construction and summary judgment rulings. (*See* Appellant's Br.) For

instance, when construing the key term "queue replenishment control rules" to

require "automatic" features, the district court improperly read a preferred

embodiment into the claims. (*See* Appellant's Br. 26-28.) A reversal on that issue

alone would warrant reversal of the entire summary judgment ruling and justify

dismissal of this cross-appeal. *See TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 973 (Fed. Cir. 1984) (dismissing cross-appeal on fees as moot because "no longer a prevailing party to whom an award could be made").

Further, Netflix's argument that Media Queue demonstrates bad intent by asserting patent claims against preexisting features is without merit. Media Queue's position is that a number of different "queue replenishment control rules" and "notification rules" are present in Netflix's system. While some of these rules may implicate items present in the prior art, these are not the only elements of the disputed claims. Netflix's argument boils down to this: if the prior art contained elements A and B, then assertion of a patent that claims elements A, B, C, D, and E must be baseless. That, however, is not the law. As with many inventions, the '243 patent builds upon the prior art by taking some known features and elevating them through creativity and innovation. The PTO thoroughly examined Mr. Gross' application and granted it – with full knowledge of the Netflix system and Hastings reference, despite the declaration from Netflix's officer. Thus, it is not improper or surprising – and certainly not indicative of bad intent or baseless allegations – that some of the features Media Queue cited as queue replenishment control rules may have existed in a prior Netflix system. Further, because there was no finding of invalidity by the Court below, any suggestion by Netflix that preexisting features anticipated the claims is unsupported.

Netflix, however, would have this Court ignore Media Queue's pre-suit investigation and substantive arguments entirely, relying instead on nothing more than hindsight reasoning and an adverse ruling. (*See* Netflix Br. 69 ("The *Outcome of this Case Justifies the Award of Fees.*") (emphasis added).) But just as courts must "guard against slipping into use of hindsight" when assessing obviousness, *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966), so too must courts resist hindsight when assessing exceptionality. Instead, courts must focus on "factors relevant to the inquiry," such as "the closeness of the question, pre-filing investigation and discussions with the defendant, and litigation behavior," as well as whether "the patentee prolongs litigation in bad faith." *Computer Docking*, 519 F.3d at 1379. None of these factors counsels in favor of attorney fees in this case under any Section 285 standard. Not only are Media Queue's arguments on the merits sound, but Netflix had extensive interaction with the inventor prior to litigation through licensing discussions and the declaration it prepared for the PTO. Moreover, Media Queue did not initiate or prolong the litigation in bad faith. Thus, this Court should affirm the district court's refusal to award fees, because this infringement suit is unexceptional under any standard.

## 2.    Awarding Fees in This Case Would Not Vindicate Important Public Interests

In addition to its proposed objective recklessness standard, Netflix asks this Court to completely remove the "exceptional case" requirement from Section 285

by allowing fees whenever a defendant "vindicate[s] an important public interest" by "the invalidation of patents" or "proof of non-infringement."[9] (Netflix Br. 69.) Even if such a monumental revision of Section 285 were justified – and even if this Court, not Congress, were the proper party to do it – a fee award in this case would still not be warranted. Media Queue engaged in substantial pre-suit evaluation of its claims, brought suit against a small number of closely related companies, litigated in good faith, and proffered reasonable claim construction and infringement arguments. Contrary to Netflix's suggestion, punishing Media Queue simply for its status as a nonpracticing plaintiff does not serve the public interest.

Amici Internet Retailers submitted a brief in support of *en banc* hearing of Netflix's cross-appeal that highlights the inappropriateness of this case for redefining the Section 285 standard and awarding fees. Because the unexceptional facts of this case stand in such stark contrast to the practical arguments raised by Amici, this Court should affirm the denial of fees under even Netflix's extreme vindication standard. Amici Internet Retailers describe a number of negative

---

[9] Netflix nowhere explains how successful defense of a patent infringement suit satisfies the statutory requirement that a case be "exceptional." 35 U.S.C. § 285. Moreover, to the extent that proof of non-infringement vindicates important interests, so too does proof of infringement. Yet, nowhere in its arguments for an "evenhanded" approach does Netflix suggest reducing the Section 285 threshold from a finding of willfulness to a mere finding of infringement. Further, if proof of noninfringement or proof of infringement were sufficient for an exceptional case finding, essentially every patent case would be exceptional, vitiating the requirement and contravening Section 285's plain language and Congressional intent.

implications of the current law that are strikingly absent from the case at hand.
Seeking to have this Court speculate that the number of defendants equates with
the merits of a case, Amici note the increasing number of defendants per suit,
citing to a complaint naming *109* separate defendants. (Amici Internet Br. 10-11.)
Media Queue, however, filed suit against only *five* defendants. Those five
defendants, moreover, are closely related in that they offer online rental services to
subscribers based on rental queues. Likewise, Media Queue's patent is directed to
improved notification systems, and its infringement allegations narrowly target
those defendants' systems. This is simply not the case of one plaintiff targeting a
multitude of generic online retailers in hopes of extracting a nuisance settlement.

Amici also point to the high costs of litigation arising from extensive
discovery obligations. (Amici Internet Br. 12-13.) However, the scope of
discovery in each case is a matter properly left to the sound discretion of the trial
court. Further, Amici fail to note that Media Queue engaged in very limited
discovery in this case. Media Queue took only two depositions and proffered only
one set of interrogatories. If discovery costs justify wholesale revision of Section
285 or the vindication of public interests, this Court should save those actions for a
more appropriate case where those costs are directly implicated. Indeed, if Amici
truly want to use this case as a vehicle to curb litigation costs, their focus should be
on Netflix, not Media Queue. At the beginning of this case, Netflix estimated its

litigation costs as high as $5.3 million.[10] (A1030-31.) In its fees motion, Netflix sought more than $1 million, despite "achiev[ing] a reasonably prompt summary judgment" under an expedited schedule. (A2328.) If Media Queue's allegations are as weak as Netflix claims, perhaps the most exceptional thing about this case is how Netflix's counsel charged more than $1 million in fees in a case involving two depositions, a single set of interrogatories from the plaintiff, and an expedited summary judgment. The American Rule, in which each side bears its own fees with few exceptions, is best suited to incentivize parties to rein in their own counsel from excessive fees.

The only real fact that Netflix or Amici point to in this case is Media Queue's status as a nonpracticing entity. That status, however, does not justify awarding attorney fees under any standard. Section 285 does not contain a nonpracticing entity exception. Nor does this Court devalue plaintiffs or the patents they own based on their size or business model. Indeed, "[a] duly granted patent is a grant of the right to exclude *all infringers*, not just those of comparable size." *Brooks*, 393 F.3d at 1384 (emphasis added). Because Netflix cannot offer any real justification for fees under even its most extreme proposal, this Court should affirm the district court's denial of fees regardless of the standard applied.

---

[10] For comparison, Defendant-Appellee Blockbuster, Inc. – who did not move for attorney fees in this case – estimated its litigation costs to be less than $1 million. (A1031.) Thus, Netflix and Blockbuster's upper bound cost estimates differed by over $4 million. *See id.*

**D.  This Court Should not Revise Current Law Because it is Evenhanded and Consistent with Related Bodies of Law**

Even if Media Queue was the proper party to contest this issue, Netflix's entire argument for a new Section 285 standard rests on a fundamentally flawed premise:  that the current Section 285 standard is not applied in an evenhanded manner to plaintiffs and defendants.  Once this mischaracterization is exposed, however, it becomes readily apparent that Section 285 operates in perfect harmony with Rule 11, copyright and trademark law, and the district court's discretion.

**1.  Applying a Different Standard to Willful Infringement and Frivolousness Does not Create a Dual Approach Because the Underlying Conduct is Different**

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions." *Brooks*, 393 F.3d at 1381.  From this universe of possible bases for an exceptional case finding, Netflix arbitrarily selects two – willful infringement by defendants and frivolous allegations by plaintiffs – and asks this Court to measure the vastly different underlying conduct by the same standard.  But as the Tenth Circuit aptly noted in the trademark context:

> [W]e disagree that there should be, or even could be, perfect harmony between the standard for awarding attorney fees to a prevailing plaintiff and a prevailing defendant.  The underlying conduct under

scrutiny is different. When attorney fees are awarded against a defendant, the court looks to whether the defendant's *acts of infringement* were pursued in bad faith. When attorney fees are awarded against a plaintiff, the court looks to the plaintiff's conduct *in bringing the lawsuit and the manner in which it is prosecuted.*

*Nat'l Ass'n of Prof'l Baseball Leagues, Inc.*, 223 F.3d 1143, 1147 (10th Cir. 2000) (emphasis in original). This rationale applies equally here. Frivolousness is no more related to willful infringement than vexatious litigation or inequitable conduct. Indeed, the only real relationship that exists is that they can each act as a basis for an exceptional case finding under Section 285. Surely that alone cannot mean that the entire spectrum of underlying conduct must be measured by an identical standard for Section 285 to be applied evenhandedly.

Rather than confronting this analytical disconnect between willfulness and frivolousness, Netflix creates a smokescreen by exaggerating the connection between willfulness and exceptionality.[11] Netflix would have this Court believe that a finding of willful infringement is tantamount to an award of attorney fees. This Court, however, has repeatedly dismissed that very notion. *See, e.g., Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 1573 n.4 (Fed. Cir. 1996) ("Even where damages are increased under Section 284 [for willful infringement], a court may decline to

---

[11] Netflix offers flawed empirical data to support its claim that "defendants are frequently found to have willfully infringed and are thus often required to pay plaintiffs' attorneys' fees." (Netflix Br. at 54.) The article cited by Netflix summarizes data ranging from *seven to twenty-four years before* the current willful infringement standard was adopted in *In re Seagate Technology, LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007).

award attorneys fees under Section 285."). Although a trial court must provide its

reasoning when denying fees after finding willful infringement, that finding

changes neither the movant's burden nor the court's standard of review. *See, e.g.,*

*id.* at 1573. In fact, this Court requires a court's reasoning whenever "attorney fees

are denied despite the presence of one or more of the circumstances listed above,"

whether it be bad faith, misconduct, or inequitable conduct. *Wedgetail,* 576 F.3d at

1305-1306.

Thus, the current standard is evenhanded. Section 285 treats a finding of

willful infringement no differently than findings on any of the other exceptionality

bases.[12] For example, in deciding whether an award of attorney fees is appropriate,

this Court treats willful infringement the same as inequitable conduct, which can –

but does not automatically – lead to an award of attorney fees. *See Nilssen v.*

*Osram Sylvania, Inc.,* 528 F.3d 1352, 1358 (Fed. Cir. 2008) ("[C]ourts may award

attorney fees in inequitable conduct cases, but are not required to do so."). Taking

Netflix's argument to its logical conclusion, inequitable conduct and willful

infringement should be measured by the same standard because they are treated

---

[12] Netflix expresses concern that current law's "extremely exacting standard"
requires clear and convincing evidence to justify an exceptional case finding. (*See*
Netflix Br. 55.) Netflix fails to mention that willful infringement and inequitable
conduct findings also require clear and convincing evidence. *Seagate,* 497 F.3d at
1371; *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995).

identically under Section 285.[13]  That, however, would surely put the cart before the horse.  Section 285 is an extraordinary remedy for exceptional cases, not a catch-all tool for shaping substantive patent law.

## 2. Current Law is in Harmony with Rule 11

Conduct that violates Rule 11 can also be a basis for an exceptional case finding under Section 285.  *Brooks*, 393 F.3d at 1381.  Frivolousness under Rule 11, moreover, is the basis at issue in this cross-appeal because Netflix questions the strength of Media Queue's case.  But in its attempt to use Section 285 to bypass the demanding Rule 11 standard, Netflix struggles to distinguish the two.  Indeed, Netflix ultimately argues that these analogous bases are *too* similar, such that this Court's law purportedly renders Section 285 superfluous.[14]

As this Court has made clear, however, Rule 11 and Section 285, while similar, are not identical.  *Digeo*, 505 F.3d at 1368.  Rule 11, unlike Section 285, is not limited to "exceptional cases," so Rule 11 provides several alternative mechanisms to limit sanctions to appropriate cases.  First, Rule 11's safe harbor provision allows parties to correct the problem before moving for sanctions.  Fed.

---

[13] Netflix attempts to address this glaring logical inconsistency in a single dissembling footnote, arguing that "objective recklessness" will equate to an "intent to deceive" in "virtually all cases of inequitable conduct."  (Netflix Br. 68 n.10.)

[14] Netflix conveniently ignores that Section 285 applies to a wide variety of conduct by plaintiffs and defendants other than conduct that violates Rule 11.  See *Brooks*, 393 F.3d at 1381.

R. Civ. P. 11. Second, Rule 11 contains a burden-shifting mechanism, whereby the burden shifts to the non-movant to show reasonable pre-suit inquiry. *Digeo*, 505 F.3d at 1368. As this Court explained:

> Thus, had [defendant] brought a successful Rule 11 motion against [plaintiff], the burden would have shifted to [plaintiff] to show it did conduct a reasonable pre-suit investigation. That Rule 11 conduct, if so found by the district court, could have served as the basis for a separate, § 285 motion in which [defendant] would have to show the exceptionality of the case by clear and convincing evidence.

*Id.* And here, as in *Digeo*, "there was no such [Rule 11] finding." *Id.* Rather than moving for sanctions under Rule 11, Netflix instead waited until receiving a summary judgment ruling before moving for fees under Section 285. In so doing, Netflix not only sidestepped the safe harbor provision of Rule 11, but also invited hindsight reasoning into the frivolousness equation.

Netflix now asks this Court to render Rule 11 virtually meaningless by making Section 285's "exceptional case" requirement less demanding than Rule 11. Such disparate treatment, however, is justified by neither the plain language of the statute, nor Congressional intent. *See Forest Labs.*, 339 F.3d at 1329 ("§ 285 is limited to circumstances in which it is necessary to prevent 'a gross injustice' to the accused infringer.") (citations omitted) (quoting S.Rep. No. 79-1503 (1946)).

### 3. Current Law is in Harmony with Other Areas of Intellectual Property Law

This Court's law is in harmony with copyright and trademark law as well. As an initial matter, the copyright context forms an imperfect analogy to patent law, because in copyright cases, fees are available even if a case is not "exceptional." *See* 17 U.S.C. § 505. Yet, despite this significant difference, the Supreme Court did not advocate a particular standard for fees in copyright cases in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994), but instead merely required that fees be awarded in an evenhanded manner to plaintiffs and defendants.[15] Because Section 285 applies evenhandedly, current law comports with *Fogerty.*

In the trademark context, circuit courts have not adopted a uniform standard for awarding fees. Many courts require bad faith, and others list bad faith as a possible basis for a fee award. *See, e.g.*, *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194-195 (2d Cir. 1996) (requiring bad faith); *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1320 (11th Cir. 2001); *Nat'l Ass'n*, 223 F.3d at 1147 (finding "[n]o one factor determinative" but listing the "the plaintiff's bad faith in bringing the suit" as a possible basis). Requiring bad faith in patent cases lacking "misconduct in conduct of the litigation or in securing the patent," *Brooks*, 393 F.3d at 1381, is entirely consistent with those cases.

---

[15] Moreover, at issue in *Fogerty* was a totally bifurcated regime where "prevailing plaintiffs are generally awarded attorney's fees *as a matter of course*, while prevailing defendants must show that the original suit was frivolous or brought in bad faith." *Fogerty*, 510 U.S. at 520-21 (emphasis added).

## 4. Current Law Provides District Courts with Ample Discretion

Netflix's assertion that the Section 285 standard improperly constrains a district court's discretion is similarly misplaced. As an initial matter, even if the threshold requirement of an "exceptional case" is met, the district court always retains discretion to award or deny fees. *Forest Labs.*, 339 F.3d at 1328. Moreover, the threshold determination of an "exceptional case" is also vested with judicial discretion. When Netflix characterizes the Section 285 standard, it ignores critical language: "*Absent misconduct in conduct of the litigation or in securing the patent*, sanctions may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks*, 393 F.3d at 1381 (emphasis added). In other words, if appropriate discretionary factors such as misconduct are present, the district court can award fees on a reduced showing. In the absence of misconduct, however, the standard appropriately constrains the district court's discretion to prevent consideration of inappropriate factors. Netflix, however, focuses much of its arguments on precisely those improper factors – the plaintiff's status as a non-practicing entity, the number of defendants in the suit, and hindsight – as its justification for a reduced fees standard under Section 285.

**E.    Netflix Must Raise this Issue Before Congress Rather than this Court, Because it Seeks to Remove the "Exceptional Case" Requirement from Section 285 for Prevailing Defendants**

For all its bluster about seeking an evenhanded approach to Section 285,

Netflix reveals its true position in one short sentence: "If anything, it should be

easier for patent defendants than patent plaintiffs to obtain fees." (*See* Netflix Br.

61.) In effect, Netflix asks this Court to usurp Congress' role by writing the

threshold statutory requirement of an "exceptional case" out of Section 285 for

prevailing defendants. Media Queue, by contrast, merely asks this Court to

continue applying Section 285 as plainly written, and allow attorney fees only in

truly exceptional cases.

Netflix first asks this Court to tip the scales in defendants' direction by

applying an objective recklessness standard to plaintiffs. If this Court adopts

Netflix's suggestion, however, defendants gain easier access to fees under Section

285 than Rule 11. As Netflix's proposed standard devalues Rule 11, claims for

attorney fees under Section 285 will become all the more common, even in the

most unexceptional of cases. If current law truly promotes nuisance settlements as

Netflix claims, the proposed law will have the opposite effect. Section 285 will

transform from an exceptional remedy into a carrot on a stick, encouraging

defendants to ignore reasonable settlement offers and extend litigation in hopes of

a later fee award. Indeed, one need look no further than Netflix's own behavior to

foreshadow future litigation under the proposed law. Here, Netflix estimated *over $5 million* in litigation costs at the outset, (A1030-31), and later sought *over $1 million* in fees, despite "achiev[ing] a reasonably prompt summary judgment" and strenuously arguing that this case was so weak as to be exceptional under current law. (A2328.) Congress, however, drafted Section 285 to apply equally to prevailing plaintiffs and defendants in "exceptional cases," and this Court should not upset that balance to afford defendants the windfall that Netflix desires.

Netflix also seeks to have this Court decide that "the vindication of an important public interest" should be sufficient to justify a fee award. (Netflix Br. 69.) As examples of such interests, Netflix offers "the invalidation of patents" and "proof of non-infringement." (*Id.*) Thus, under Netflix's proposed regime, almost any legal victory by a defendant would satisfy the threshold requirement of Section 285. Successful defense of a patent infringement suit, however, is not "exceptional" under any definition of the word. If Netflix wants Section 285 redrafted as a punitive tool to be used against nonpracticing plaintiffs in unexceptional cases, Netflix must ask Congress, not this Court.

Further, the negative implications of the current system described by Netflix and Amici Internet Retailers are more complex than Section 285. They implicate larger issues such as joinder rules, discovery practices, courts' enforcement of Rule 11, and patent quality. A judicial rewrite of Section 285 is not a panacea for the

- 56 -

perceived ills of the patent system; and moreover, Congress is best suited to balance the competing public interests relative to fixing the "system" to the extent it has flaws. One such competing public interests is whether a judicial rewrite of Section 285 would put a chill on the enforcement of patent rights, including by small companies or lone inventors who lack the resources to litigate their rights in a virtual "loser pays" system.

## CONCLUSION

The district court incorrectly construed the claim terms "notification rules," "queue replenishment control rules," and "authorized by the subscriber," and improperly granted Appellees' summary judgment motions on the basis of those erroneous constructions. The district court properly rejected Appellees' indefiniteness arguments and properly denied Netflix's motion for attorney fees under 35 U.S.C. § 285.

Therefore, Media Queue respectfully requests that this Court reverse the district court's construction of claim terms "notification rules," "queue replenishment control rules," and "authorized by the subscriber," and adopt the claim constructions proposed by Media Queue; reverse the district court's summary judgment ruling; and affirm the district court's denial of Netflix's motion for fees.

Dated:  September 9, 2010                Respectfully submitted,

John Edmonds
COLLINS, EDMONDS &
POGORZELSKI, PLLC
*Attorney for Plaintiff-Appellant Media
Queue, LLC*

# United States Court of Appeals
## for the Federal Circuit

*Media Queue vs. Netflix,* 2010-1199, -1344

## DECLARATION OF AUTHORITY PURSUANT TO
## 28 U.S.C. § 1746 AND FEDERAL CIRCUIT RULE 47.3(d)

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am an employee of Counsel Press's Washington DC Office. Counsel Press was retained by Attorneys for Plaintiff-Appellant to print the enclosed documents.

The attached MEDIA QUEUE'S CORRECTED REPLY IN SUPPORT OF ITS PRINCIPAL BRIEF AND RESPONSE IN OPPOSITION TO NETFLIX'S CROSS APPEAL has been submitted to Counsel Press, by the above attorneys, electronically and/or has been reprinted to comply with the Court's rules. Because of time constraints and the distance between counsel of record and Counsel Press, counsel is unavailable to provide an original signature, in ink, to be bound in one of the documents. Pursuant to 28 U.S.C. §1746 and Federal Circuit Rule 47.3(d), I have signed the documents for John Edmonds, with actual authority on his behalf as an attorney appearing for the party.

September 13, 2010

John C. Kruesi, Jr.

# CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COLLINS, EDMONDS & POGORZELSKI, PLLC, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On the **13th Day of September, 2010,** I serve the within **MEDIA QUEUE'S CORRECTED REPLY IN SUPPORT OF ITS PRINCIPAL BRIEF AND RESPONSE IN OPPOSITION TO NETFLIX'S CROSS APPEAL** upon:

| | |
|---|---|
| David K. Wooten | Michael A. Jacobs |
| Leisa Talbert Peschel | Matthew I. Kreeger |
| Scott Beedlove | Marcelo Guerra |
| Vinson & Elkins LLP | Morrison & Foester LLP |
| 2001 Ross Avenue, Suite 3700 | 425 Market Street |
| Dallas, Texas 75201 | San Francisco, CA 94105 |
| sbreedlove@velaw.com | mjacobs@mofo.com |
| Lpeschel@velaw.com | mkreeger@mofo.com |
| dwooten@velaw.com | mguerra@mofo.com |
| | |
| Attorneys for Appellee Blockbuster | Attorneys for Appellee Netflix |
| | |
| Steven Niebow | Daralyn J. Durie |
| Niebow Law Firm | Mark A. Lemley |
| 21800 Oxnard Street | Aaron M. Nathan |
| Suite 750 | DURIE TANGRI LLP |
| Woodland Hills, CA 91367 | 217 Leidesdoff Street |
| snn@niebowlaw.com | San Francisco, CA 94111 |
| | ddurie@durietangri.com |
| Attorney for Appellee Greencine | mlemley@durietangri.com |
| Holdings | anathan@durietangri.com |
| | |
| | Attorneys for Defendant-Cross Appellant Netflix, Inc. |

**via Express Mail and E-Mail,** by causing 2 true copies of each to be deposited, enclosed in a properly addressed wrapper, in an official depository of the U.S. Postal Service.

The brief was originally filed and served in the same manner on September 9, 2010.   12 corrected copies have been hand-delivered to the Court on this date..

September 13, 2010

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>13,852</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated:  September 13, 2010

John Edmonds
COLLINS, EDMONDS &
POGORZELSKI, PLLC
*Attorney for Plaintiff-Appellant Media
Queue, LLC*